UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------X
UNITED STATES OF AMERICA,

        -AGAINST-               MEMORANDUM AND ORDER
                              13-CR-0186 (DRH)

DANIEL PATRICK SHEEHAN,

              Defendant.
-----------------------------X
A P P E A R A N C E S:

For the Government:
    Loretta Lynch, Esq.
    United States Attorney
    Eastern District of New York
    610 Federal Plaza
    Central Islip, New York 11722
      By: Lara Treinis Gatz, A.U.S.A.

For the Defendant:
    Edward P. Jenks, Esq.
    332 Willis Avenue
    Mineola, New York 11501

    Leonard Lato, Esq.
    35 Arkay Drive - Suite 200
    Hauppauge, New York 11788

HURLEY, Senior District Judge

        Pending before the Court is a motion by defendant
Daniel Sheehan ("Sheehan" or "defendant") seeking a judgment of
acquittal pursuant to Fed. R. Crim. P. ("Rule") 29 as to Count
Two or, alternatively, a new trial on that Count under Rule 33.

BACKGROUND

        By indictment filed on March 20, 2013, the defendant
was charged in Count One with a "Hobbs Act Extortion" in that he
allegedly "demanded money from the Home Depot Store in Huntington
Station, New York via threatening letters and telephone calls to

the store's manager" in violation of 18 U.S.C. § 1951, and, under Count Two, with the "Use of a Destructive Device to Commit [the] Extortion" charged in Count One in violation of 18 U.S.C. § 924(c)(1)(B)(ii).[1]

The case was tried before a jury over several days beginning on June 11, 2013. During the defendant's opening statement, he acknowledge his guilt as to Count One consistent with what he told members of law enforcement upon his arrest. But he denied the allegations in Count Two upon the ground that "[t]he device was not a destructive device." (Trial Transcript ("Tr."), 140:19).)

The jury returned a verdict of guilty as to not only the uncontested count, i.e. Count One, but also Count Two, resulting in the present motion which, as noted, is directed solely at Count Two.

                                        FACTS

The following facts are undisputed. Beginning in May of 2012 and extending to November of that year, defendant implemented an elaborate scheme intending to extort $2,000,000 from the Huntington Station Home Depot.

As one of the initial steps in that process, Sheehan purchased a prepaid unregistered cell phone which he activated

---

[1] Count Three was dismissed on the government's application by Order dated June 10, 2013 (docket # 28).

using a pay phone with the expectation that the prepaid phone would be untraceable. (Gov't's Ex. 34 (i.e. Def.'s Nov. 7, 2012 Statement at 1).) Shortly before purchasing the phone, Sheehan assembled what he described as a "pipe bomb," using powder extracted from shotgun shells, "a small piece of black pipe and end caps," together with "an ignitor from an 'Estes' model rocket." (Id.) That device was successfully test-fired by Sheehan, "in [a] shed located at 6 Fowler Place" in Dix Hills with the resulting explosion leaving a "hole in the floor." (Id.)

Around the same time as the test-firing, although precisely when is unclear from his statement, Sheehan assembled another device at the same location "using the powder from the remaining shotgun shells, another pipe and end caps, a 9 volt battery[, . . .] a pull string switch, and another ESTES ignitor." (Id.) The device was then placed in a "lamp box." (Id., at 2.)

"Days later, [he, again according to his statement] went to the Huntington Station Home Depot . . . [and] placed [the lamp box containing] the device on the shelf in the Lighting Department." (Id.)

The defendant told the FBI during the November 2012 interview that the above referenced pull string switch "wasn't connected to the shelf." (Id.) Accordingly, he went back to the

store "[a]bout 1 week or 10 days later . . . to attach the string to the rack so that it would look like it would work."[2]  (Id.)  This post-planting modification was accomplished via "construction adhesive" he brought to the site secreted "in a Ketchup packet."  (Id.)

In mid-October of 2012, defendant sent an extortion letter to the Huntington Home Depot, writing

TO THE STORE MGR.

THERE IS A BOMB IN A LIGHT box IN THE
LIGHTING DEPT. SKEW # 491-803

YOUR IN NO DANGER

THE BATTERY IS NOT CONNECTED + IGNITER IS
SEPPERATED.  IT CANNOT GO OFF! I NEEDED TO
PROVE I CAN MAKE A DEVICE + GET 'EM IN THE
STORES UNDETECTED.

I WANT TWO MILLION (1.5 IN 100, 5 IN 50)
OR I WILL SHUT DOWN ALL YOUR LI STORES ON
BLACK FRIDAY.  I CAN DETONATE 3 DEVICES IN 3
DIFFERENT STORES REMOTELY VIA TRAC FONE.
THEN BOMB THREATS WILL CLOSE THE REST.  DOING
THIS ON THANKSGIVING WILL ASSURE NO ONE GETS
HURT, EXCEPT YOUR WALLET.

I WILL GIVE YOU UNTIL THE WEEK OF OCT.

---

[2]  The above excerpt from Sheehan's statement suggests that he is indicating that the device he placed in Home Depot was intended to be, and was in fact inoperable.  Indeed earlier in his statement, he describes the device as "inert."  (Gov't's Ex. 34 at 1.)  But, of course, the jury was not required to accept his characterization given, inter alia, the fact that it exploded during the attempted deactivation process following its discovery, and the testimony of government expert witnesses that dropping Sheehan's work product or endeavoring to disarm it by unscrewing one of the end caps could have brought about an explosion.

26TH TO NOTIFY THE SUITS IN ATLANTA + TO GET
THE CASH.

IF YOU GO TO THE POLICE OR FEDS I WILL GO
TO THE MEDIA - THAN YOU RISK SCARING OFF WAY
MORE THAN TWO MILLION IN SALES, AND COPY CAT
ACTIONS.

PAY ME THIS ONE TIME AND YOU HAVE MY WORD
YOU WILL NEVER HEAR FROM ME AGAIN.  I AM
GOING TO A WARM CLIMATE WITH THIN BROWN GIRLS
AND DRINK MYSELF TO DEATH.  I WILL ALSO GET A
2 MILL - LIFE INSURANCE POLICY NAMING HOME
DEPOT BENEFICARY.[3]

(Gov't's Ex. 36.)

Upon receipt of the defendant's letter, the manager of

the Home Depot contacted the police and evacuated the store.  The

police responded to the location and tried to disarm the weapon

via the use of a robot and a so-called Avon device.[4]  During the

disarming process, however, the pipe bomb exploded, shattering

two glass windows, propelling metal fragments into the

surrounding walls, ceiling and doors.  Thereafter, defendant, as

explained in his November 7, 2012 statement, initiated further

---

[3]  Defendant's letter is quoted precisely as it was written.
Misspellings, defendant explains, were "purpose[ful]" apparently
intended to obfuscate any link between him — presumably perceived
to be a good speller — and the subject wrongdoing.  (Gov't's Ex.
34 at 2.)

[4]  Suffolk County Police Officer Anthony Gonzalez, a
certified bomb technician with the Department's "Emergency
Service Section" (Tr., 182:1), used the robot with a PAN
disrupter attachment – which "looks like a shotgun," (id.,
220:22), – to expel an Avon round to slide along the pipe to hit
and dislodge an end cap, thereby disarming the device, (id.,
220:18-221:1).

contact with Home Depot in an effort to complete his extortion plan.

## CENTRAL ISSUE AT TRIAL

Defendant identifies the only contested "question at the trial was whether the device that Sheehan left inside the Huntington Station Home Depot was a pipe bomb, as the government contended, or whether it was a model of a pipe bomb, as Sheehan contended." (Def.'s July 1, 2013 Letter in Supp. at 1.) Given that the government alone bears the burden of proof, and that the term "model of a pipe bomb" or like phrase does not appear in the relevant statutory language, I prefer to describe the pivotal contested trial issue under Count Two as whether the subject device was proven by the prosecution to be a "destructive device" as charged by the grand jury.

## OVERVIEW OF BASES FOR CURRENT MOTION

Defendant in seeking the relief requested, maintains that:

(1) he is entitled to a judgment of acquittal because (a) "'a pipe bomb[]' . . . must contain a fusing[5] system" to be a destructive device, under 18 U.S.C. § 921(a)(4)(A)(i), an element absent from Sheehan's device and (b) the device, with its

---

[5]  The referenced term has two acceptable spellings, viz. "fusing" and "fuzing," both of which appear in the record including post-trial submissions.  The "fusing" spelling will be used in this opinion except in those instances in which a quoted passage embodies the alternate spelling.

inoperable fusing system, "could not have been 'readily converted' to operate" under § 921(a)(4)(C) because the disconnected "igniter was inside the pipe" (Def.'s July 1, 2013 Letter in Supp. at 11);

(2) in the alternative, he should be granted a new trial because (a) "the government repeatedly misstated the evidence <u>and</u> injected its personal belief into its arguments" during its initial and rebuttal summations (<u>id.</u>, at 11-12), and (b) the Court's "[i]mproper and [i]ncomplete [j]ury [i]nstructions" (<u>id.</u>, 16).  "Standing alone," movant opines, "the government's improper comments – which defense counsel did not object to – probably did not deprive Sheehan of a fair trial" but those transgressions, considered in conjunction with the "Court's faulty jury charge," is said to have had that effect.  (<u>Id.</u>)[6]

Before addressing each of the defendant's arguments in

_____

[6] The Rule 29 and Rule 33 arguments, outlined above, were advanced on defendant's behalf by trial counsel Leonard Lato, Esq. ("Lato").  After the government's papers in opposition were filed, Edward P. Jenks, Esq. ("Jenks") was substituted for Lato as counsel for Sheehan.  Jenks then filed a reply to the government's submission on April 10, 2014 in which he underscored that the Rule 33 application was based not only on the insufficiency of proof but also on the "improper summation and instructional error[s]" found in the record.  (Jenks's Apr. 10, 2014 Letter at 2.)  Indeed, even if, <u>arguendo</u>, the proof is determined to be adequate, the latter two shortcomings "must stand or fall on their own merits" with this Court utilizing the same "standard of review [as the Circuit employs] on appeal." <u>Id.</u>, 1-2, <u>citing</u> <u>United States v. D'Amelio</u>, 636 F. Supp. 2d 234, 238 (S.D.N.Y. 2009), <u>rev'd on other grounds</u>, 683 F.3d 412 (2d Cir. 2012).

detail, reference to the applicable statutory definition of a destructive device is in order.

## STATUTORY DEFINITION OF DESTRUCTIVE DEVICE

Count Two charges that "[o]n or about October 15, 2012, within the Eastern District of New York, the defendant DANIEL PATRICK SHEEHAN did knowingly and intentionally use and carry a destructive device, to wit: a pipe bomb, during and in relation to a crime of violence, to wit: the crime charged in Count One, and did knowingly and intentionally possess said destructive device in furtherance of such crime of violence."  (Indictment 13 CR 0186.)

As noted by the defendant, the "relevant statute is Section 921(a)(4) of Title 18 of the United States Code." (Def.'s July 1, 2013 Letter in Supp. at 16.)  That subsection provides in pertinent part:

> (4) The term "destructive device" means- -
>   (A) any explosive, . . .
>      (i) bomb, . . . .;
>
>      and
>
>   (c) any combination of parts either designed or intended for use in converting any device into [an explosive bomb] and from which a destructive device may be readily assembled.
>
> The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon.

18 U.S.C. § 921(a)(4).

Absent from the statute are definitions for the terms "explosive," "bomb," "explosive bomb," or "readily assembled."

## APPLICATION FOR JUDGMENT OF ACQUITTAL
## UNDER RULE 29 AS TO COUNT TWO

1. Legal Standard

Rule 29 provides in pertinent part that "the court . . . must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Civ. R. of Crim. P. 29(a). In deciding a Rule 29 motion, a court is required to construe all the evidence and draw all inferences in favor of the government. See United States v. Puzzo, 928 F.2d 1356, 1361 (2d Cir. 1991). As a result, "[t]he court may not assess witness credibility, resolve inconsistent testimony against the verdict, or otherwise weigh the significance of the evidence." Mehler, Gleeson and James, Federal Criminal Practice: A Second Circuit Handbook, § 29-2 at 511 (LexisNexis, 12th Ed. 2012), and cases cited therein. For Sheehan to prevail, he must demonstrate that "no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." United States v. Vasquez, 271 F.3d 364, 370 (2d Cir. 2001)(citation and internal quotation marks omitted).

2. Defendant's Rule 29 Motion Based on Claimed
   Absence of an Operable Fusing System

In seeking a judgment of acquittal, Sheehan maintains, as earlier noted, that the government failed to establish that

the device Sheehan planted in the Huntington Station Home Depot was a "destructive device" as that term is statutorily defined given evidence that it lacked an operable fusing system.[7] That purported gap is said by movant to be fatal to the prosecution. Defendant cites in support of his position (1) Christopher Rigopoulos's ("Rigopoulos") testimony as a government expert, identifying the components of a destructive device as including "[a]n [e]lectrical [f]uzing [s]ystem" (see Gov't's Ex. 32), (2) the testimony of defendant's expert Warren L. Parker ("Parker") that Sheehan's device lacked the necessary components to be legitimately labeled as an explosive bomb under § 921(a)(4)(A)(i) nor could it be "readily assembled" to acquire that status under § 921(a)(4)(C), and (3) an argument predicated on dictionary definitions from Merriam-Webster of the terms "pipe" and "bomb" leading to defense counsel proffering that "Rigopoulos's opinion that Sheehan's device could have detonated accidentally from a fall or from an end-cap twisting is immaterial" (Def.'s July 1, 2013 Letter in Supp. at 17).

Those predicates for defendant's Rule 29 Motion will now be addressed seriatim.

---

[7] The definition of "destructive device" under § 921(a)(4) in the FIREARMS Chapter of Title 18 is provided supra in the text. An identical definition of the term appears in 26 U.S.C. § 5845(f). See United States v. Posnjak, 457 F.2d 1110, 1114 (2d Cir. 1972). As a result, some decisions under 26 U.S.C. § 5845(f), as well as those under § 921(a)(4), are instructive for present purposes.

(a) <u>Rigopoulos's Testimony</u>

Rigopoulos did indicate that an electrical fusing system is a component of a destructive device. But he also testified that "[i]n this case there is an electrical fuzing system present." (Tr., 418:7-8.) Moreover, he explained to the jury that a pipe bomb may consist of a pipe, two end caps and smokeless powder, without a fusing system. (<u>See</u> Tr., 410:14-18.) Such a pipe bomb, i.e. one without a fusing system, may explode, "if [the device] was dropped, or if somebody [in an effort to defuse the bomb] tried to open up [i.e. unscrew one of the] end caps" and there was smokeless powder in the pipe threads. (<u>Id.</u>, 410:25-411:1.) The "heat" generated from the resulting "friction" may trigger an explosion. (<u>Id.</u>, 410:19-411:5; <u>see also</u> <u>id.</u>, 434:10-436:13.)

Defendant's reliance on the testimony of Rigopoulos for the proposition that a pipe bomb must have a fusing system is myopic in the sense that its lone focus is upon his generic recitation as to the components of destructive devices. That portion of his testimony, considered in conjunction with what Parker said to the jury, appears to be the evidentiary lynchpin of the application under discussion. But the jury is entitled to consider Rigopoulos's testimony in its totality or some lesser portion as it finds credible. Within that body of evidence is his opinion with a concomitant detailed explanation, that even

if, _arguendo_, Sheehan's device lacked a fusing system, it was, nonetheless, a destructive device readily capable of exploding as it did on October 15, 2012. By the same token, the jury may have accepted Rigopoulos's testimony that the device had a fusing system thus rendering the discussion about its presence or absence academic.

    (b) Parker's Testimony

    Parker testified on behalf of the defendant. He, like Rigopoulos, presented the jury with impressive credentials as to his claimed expertise regarding explosives.

    Parker disagreed with the main thrust of Rigopoulos's testimony. In his view, the device was not an "explosive bomb" in that it "lack[ed] the assembly to be exploded" and was, "[i]n fact . . . assembled in a manner that could not be exploded electrically or accidentally by someone touching some other electrical component."[8]  (Tr., 486:14-17.)

    Defendant's insistence that a pipe bomb must have a

_____

[8] The government called FBI Senior Forensic Scientist Kirk Yeager, PhD ("Yeager") as part of its rebuttal case. Yeager disagreed with major portions of Parker's testimony, particularly with his statements that (1) smokeless powder has an auto ignition temperature over "600 degrees Fahrenheit" and (2) that the "friction caused by the unscrewing of a[n end] cap" could not cause an explosion. Yeager characterized the first of those two opinions as "wildly inaccurate," (Tr., 627:10-19), and the second as "absolutely incorrect," (_id._, 635:2-11), in each instance followed by a lengthy explanation. Parenthetically, the referenced statements by Parker are found at Tr., 495:5-16.

fusing system is supported by Parker's testimony.  But the jury
was entitled to reject any portion, including that portion of his
testimony, and accept as accurate the contrary opinions voiced by
the government's experts.

(c) Merriam-Webster Dictionary Definitions

In urging that the definitions of "pipe" and "bomb" in
the Merriam-Webster Dictionary renders "immaterial" the
explanations provided by Rigopoulos about how the Sheehan device
could explode without a fusing system, defendant argues:

> Section 921(a)(4) does not define
> "explosive," "bomb" or "explosive bomb."
> Thus, to obtain the definitions, one must
> look to a dictionary, because "[a]
> fundamental canon of statutory construction
> is that, unless otherwise defined, words will
> be interpreted as taking their ordinary,
> contemporary, common meaning." Perrin v.
> United States, 444 U.S. 37, 42 (1979).
>
> An "explosive" is "[a]ny substance or
> device that can produce a volume of rapidly
> expanding gas in an extremely brief period."
> "Explosive," Merriam-Webster.com,
> http://www.merriam-
> webster.com/dictionary/explosive (last
> visited June 30, 2013).  A "bomb" has several
> meanings, including "an explosive device
> fused to detonate under specified
> conditions," "a vessel for compressed gases"
> and "a lead-lined container for radioactive
> material."  "Bomb," Merriam-Webster.com, id.
> at /bomb (last visited June 30, 2013).
> Congress, by modifying the noun "bomb" with
> the adjective "explosive," must have intended
> the first definition, "an explosive device
> fused to detonate under specified
> conditions."
>
> One example of an explosive bomb is a pipe

> bomb.  <u>See, e.g.</u>, <u>United States v. Nunez</u>, 146
> F.3d 36, 37 (1st Cir. 1998)(observing that
> pipe bombs are "destructive devices").  The
> definition of "pipe" that is relevant to this
> case is "a tubular or cylindrical object."
> "Pipe," <u>Merriam-Webster.com</u>,
> <u>http://www.merriam-</u>
> <u>webster.com/dictionary/pipe</u> (last visited
> June 30, 2013).  Thus, a "pipe bomb" is "a
> tubular or cylindrical object" that can
> produce a volume of rapidly expanding gas in
> an extremely brief period" when "fused to
> detonate under specified conditions."  In
> light of this definition, Rigopoulos's
> opinion that Sheehan's device could have
> detonated accidentally from a fall or from an
> end-cap twisting is immaterial.  If the
> device was "<u>not fused to detonate under</u>
> <u>specified conditions," it was not an</u>
> <u>explosive bomb</u>.

(Def.'s July 1, 2013 Letter in Supp. at 16-17. (emphasis added).)

Initially the Court notes that while <u>Perrin</u>, 444 U.S. at 42, does state "[a] fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning," there is nothing in the decision to suggest that in the absence of a statutory definition of a common term "one must look to a dictionary."  In fact, that approach was not utilized in <u>Perrin</u>.

Of course, dictionary definitions – even of common terms – may be, and often are incorporated into jury instructions and may also be utilized in assessing the merits of Rule 29 motions.  By way of an example of the latter, consider <u>United</u>

States v. Graziano, 616 F. Supp. 2d 350, 352 (E.D.N.Y. 2008), in
which Graziano sought under Rule 29 to vacate his conviction for
using a destructive device during a crime of violence.  He, like
Sheehan, maintained that device he utilized was not a
"destructive device" under 18 U.S.C. § 921 as a matter of law.
Id.  In rejecting that challenge, the district court referred to
the following definition found in the 2008 Merriam-Webster Online
Dictionary: "a 'bomb' is . . . 'a container of explosive or
incendiary material, designed to explode on impact or when
detonated by a timer or remote-control.'"  Id. at 359.  Under
that 2008 definition, unlike its counterpart found in the 2013
edition of Merriam-Webster cited by Sheehan, a device that would
"explode on impact" – if, for instance, it was dropped  –
seemingly would be a "bomb" even if not "fused to detonate under
specified conditions."  (Def.'s July 1, 2013 Letter in Supp. at
17.)  While that conclusion may be debatable, the point is that
dictionary definitions are not homogeneous over time and amongst
lexicographers.  Although such sources may be helpful in some
instances in explaining certain terms to a jury, care must be
taken not to elevate their importance to the extent they may be
invoked after-the-fact to automatically cull previously
unobjected to testimony from the record as defendant argues
should be done here.  Simply put, Sheehan's argument that the
2013 Merriam-Webster definitions of bomb and related terms render

Rigopoulos's testimony as to the explosive potential of the
subject device "meaningless" lacks merit.

The intended meaning and scope of the term "destructive
device" are to be found in the language of the statute and, if
necessary, in its legislative history and purpose.  See Perrin,
444 U.S. at 41-49 and Burns v. Alcala, 420 U.S. 575, 580-81
(1975).  Guidance may also be gleaned from judicial decisions.

> (d) Nothing in Language of § 921(a)(4)(A) or
> its Legislative History Supports Defendant's
> Argument That an Operable Fusing System is
> an Essential Element of an Explosive Bomb,
> and Relevant Judicial Decisions are Contrary
> to Defendant's Position

### (i) Statutory Language

The definitions of a destructive device found in 18
U.S.C. § 921(a)(4)(A) and 26 U.S.C. § 5845(f) identify the types
of items proscribed without, subject to a few presently
irrelevant exceptions,[9] limiting their inclusion by listing
required specific components such as, e.g., a "fusing system" for
an "explosive bomb."  That absence is presumably intentional and
runs counter to defendant's argument.

### (ii) Legislative History

The legislative history leading to the regulation of
destructive devices is provided in Posnjak, 457 F.2d at 1113-15.

---

[9]  For example, for a "rocket" to be a "destructive device"
it must have "a propellent charge of more than four ounces."  18
U.S.C. § 921(a)(4)(A)(iii).

Under both the National Firearms Act, 26 U.S.C. § 5801 <u>et</u> <u>seq.</u> and the Gun Control Act of 1968, 18 U.S.C. § 921 <u>et</u> <u>seq.</u> the legislative goal was to control "the importation, possession, and transfer of weapons, particularly guns, and to stem the traffic in certain unusually dangerous weapons, including 'destructive devices,' for which Congress saw no legitimate uses." <u>Posnjak</u>, 457 F.2d at 1111.

Reference to the legislative history, as synopsized in <u>Posnjak</u>, demonstrates that the legislators sought to, inter alia, regulate the possession of certain weapons, such as "any explosive . . . bomb," due to their capacity to cause grave damage to persons and property. That capacity, rather than the presence or absence of a particular component of a particular device was the apparent Congressional concern triggering the legislative enactments.

In sum, nothing in the legislative history pertaining to § 921(a)(4) lends credence to defendant's insistence that "'a pipe bomb[]' . . . <u>must</u> contain a fuzing system." (Def.'s July 1, 2013 Letter in Supp. 11.)

(iii) <u>Judicial Decisions</u>

Defendant's argument on this point, as earlier noted, is primarily predicated on the current dictionary definitions of the terms "pipe" and "bomb" in <u>Merriam</u>-<u>Webster</u>; tellingly absent are any case citations.

Existing case law is at odds with Sheehan's position.

See, e.g., United States v. Langan, 263 F.3d 613, 625 (6th Cir. 2001)("[T]he government need not establish that any particular component be present for a device to qualify as a destructive device.  The only requirement is that the device be capable of exploding or be readily made to explode") and United States v. Wilson, No. 92-5075, 1992 WL 227472, *2 (6th Cir. Sept. 15, 1992)(unpublished table decision)("[W]e do not read these cases as requiring the government to prove beyond a reasonable doubt that each component is present; instead, the government's burden is to prove beyond a reasonable doubt that the devices are destructive or could be readily made so.").

3. Defendant's Rule 29 Motion Based on
   Claimed Inability to "Readily Assemble"
   Component Parts Into a Destructive Device
   Under § 921(a)(4)(C)[10]

In addition to maintaining that the absence of a fusing system precluded his device from being a destructive device under § 921(a)(4)(A), Sheehan asserts that the component parts under his control could not have been readily assembled into one under subdivision (C).  That is so, the argument continues, because

_____

[10] It is also defendant's position that the Court should have limited its Charge to § 921(a)(4)(A) concerning fully assembled devices and committed error by additionally instructing the jury under a "readily assembled" theory of responsibility pursuant to subdivision (4)(C) of the statute.  That subject is discussed both here and in the portion of this decision, infra, addressing supposed charging errors.

there is a lack of evidence in the record that defendant had tape immediately on hand to link the loose igniter wires to the battery thereby rendering the fusing system operable.  And had Sheehan possessed the necessary tape, its effective use in bringing about the completion of the device, according to Parker, would have taken "minutes, [albeit] probably less than an hour" Tr., 503, which, in defendant's view, is out-of-sync with the concept of "readily assembled."[11]

It must be remembered that all the evidence must be construed most favorably to the non-movant under Rule 29.  So construed, the absence of proof that Sheehan had tape on his person while in Home Depot sometime after he planted the device is not fatal to a finding of guilt under § 921(a)(4)(C); the tape was already at the site.

Rigopoulos testified that the scotch tape attached to the lighting box in which Sheehan secreted the device was adequate to make the fusing system's circuitry complete, thus, quite simply, mooting the issue under discussion.  <u>See</u> Tr.,

---

[11]  Given that there was ample evidence for Rule 29 purposes that the device was a destructive device under § 921(a)(4)(A), the issue of whether it could also be so categorized under subsection (C) is in one sense academic.  However, the jury was not asked on the verdict sheet to specify whether they found Sheehan guilty of Count Two under the completed device theory, the readily assembled theory, or both.  Accordingly, it is appropriate to assess the adequacy of the proof under both subsections (A) and (C) of § 921(a)(4) in evaluating his application for a judgment of acquittal.

425:8-426:1; id., 435:6-16.  And independent of that proof,
Sheehan could have readily acquired other tape had it been
necessary in that he planted the device in a Home Depot store
which almost certainly carried tape among its products.  As to
continued access to the device, Sheehan, "[a]pproximately one
week" after "plac[ing] the device on a shelf in the lighting
department[] . . . returned" to the store and modified the
device.  (Gov't's July 15, 2013 Letter at 2, citing to Gov't's
Ex. 34.)

          Moreover, although the Second Circuit has not
specifically addressed the issue, there is abundant authority
from other jurisdictions indicating that whether a defendant,
such as Sheehan, had actual or constructive possession of tape or
some other ubiquitous item is a non-issue.  United States v.
Crocker, 260 F. App'x 794, 797 and cases cited therein (6th Cir.
2008)("Although the government did not introduce evidence that
the defendant possessed tape, this Court does not require showing
possession of all commonly available materials when determining
whether a destructive device could have been readily assembled. .
. . Showing possession of scotch tape was therefore not
necessary to demonstrate that the materials were readily
convertible into an explosive device"); and United States v.
Simmons, 83 F.3d 686, 687 (4th Cir. 1996)("Simmons entered a
conditional guilty plea, reserving the right to appeal the issue

of whether a gasoline-filled glass bottle with a cloth fuse could constitute a 'destructive device' if he did not have in his physical possession a match or lighter"; in response, the Fourth Circuit explained that "[w]ithout ever as much as suggesting that a defendant must possess a means by which to ignite the device, courts have uniformly held [– citing cases from the First, Fifth, and Tenth Circuits –] that a fully-assembled Molotov cocktail . . . constitutes . . . 'bomb' or 'similar device' under section 5845(f))."  But see, e.g., the following three cases cited by defendant in his "pro-se" submission filed on March 4, 2014, which I have reviewed at the request of his present attorney: United States v. Hamrick, 995 F.2d 1267, 1270-71 (4th Cir. 1993)(if part of a device is missing rendering it inoperable, the device fails to meet the legal definition of a destructive device); United States v. Malone, 546 F.2d 1182, 1184 (5th Cir. 1977)(reversing a conviction for possessing a destructive device because defendant did not possess the explosive material needed to permit an explosion); and Posnjak, 457 F.2d at 1116 ("All of the necessary components from which a destructive device may be readily assembled must be possessed in order to possess a destructive device under subparagraph (3).")(internal quotation marks omitted).[12]

---

[12]  Whether the above dictum in Posnjak was meant to extend to such incidental and readily available items as tape, or matches as in United States v. Simmons, 83 F.3d 686 (4th Cir.

A related though seemingly secondary subsection (4)(C) argument advanced by Sheehan pertains to the time it would take to assemble the component parts into a completed device.

By way of background, the defendant admitted in his statement to placing a device that contained (1) a six-inch pipe filled with smokeless powder and bird shot, (2) two end caps, (3) an igniter, (4) a 9-volt battery, (5) wires, and (6) a pull chain switch, in the Huntington Home Depot. (Gov't's Ex. 34.) The government "does not dispute that the wire from inside the pipe and the wire from the pull chain were not connected to the battery." (Gov't's July 15, 2013 Letter in Opp'n at 7.) However, as explained to the jury by Rigopoulos, "[i]t would not be difficult at all" to attach the wire from inside of the pipe, as well as the wire from the pull chain, to the battery. Tr., 425:8-11. Scotch tape from the lamp box could have been used for that purpose, with the entire process taking, according to Rigopoulos, "ten minutes or less." Id., 617:4-13.[13] Although the term "readily assembled" necessarily connotes a brief period of time, there is nothing in the record either at trial or via post-trial submissions, to indicate that "ten minutes or less"

---

1996), remains unanswered by the Circuit but need not be further addressed here for the reasons previously indicated.

[13] Rigopoulos's estimate is based on Parker's assumption – which Rigopoulos testified he believed was erroneous – that "no wires from the pipe [were] connected to either the battery or the pull chain." Tr., 616:19-617:13.

fails to comfortably satisfy that standard.

4. Conclusion as to Defendant's Motion for a
   Judgment of Acquittal

Defendant made a Rule 29 motion at the end of the government's case-in-chief, after the defense case, and after all the evidence was before the jury. In each instance, the Court reserved decision. As defendant points out, the Court "must decide the first motion based on the government's direct case and the third motion based on all of the evidence." (Def.'s July 1, 2013 Letter in Supp. at 11, *citing* United States v. Velasquez, 271 F.3d 364, 371 (2d Cir. 2001)).[14]

With respect to the substance of the outstanding Rule 29 motion, and having evaluated that motion under the applicable legal standards, it is clear that, for the reasons provided, defendant is not entitled to a judgment of acquittal. As to the one contested issue, viz. "whether the device . . . Sheehan left inside the Huntington Station Home Depot was a pipe bomb," (Def.'s July 1, 2013 Letter in Supp. at 1), abundant evidence supports the jury's determination that it was under both subdivisions (4)(A) and (4)(C) of 18 U.S.C. § 921(a).

APPLICATION FOR A NEW TRIAL UNDER RULE 33 AS TO COUNT TWO

1. Legal Standard

---

[14] The second motion "became moot when the government presented a rebuttal case." (Def.'s July 1, 2013 Letter in Supp. at 11, *citing* Fed. R. Crim. P. 29(a)).

Rule 33 provides that a "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The relief should be granted if "it would be a manifest injustice to let the guilty verdict stand." United States v. James, 712 F.3d 79, 107 (2d Cir. 2013)(citation and internal quotation marks omitted). Conversely, a new trial should not be granted when the Court is "satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict." United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001)(citation and internal quotation marks omitted). In making its determination, the Court should consider the totality of the relevant circumstances including, as defendant contends occurred here, "improper summation comments" made by the prosecutor and flawed legal instructions given to the jury by the Court. (Def.'s July 1, 2013 Letter in Supp. at 11, citing United States v. Washington, 263 F. Supp. 2d 413, 416, 420 (D.Conn. 2003) and United States v. Kramer, 172 F. Supp. 288, 290 n.4 (W.D.Pa. 1959) aff'd 279 F.2d 754 (3d Cir. 1960).)

"Under Rule 33, the [C]ourt has broader powers than it does in determining a motion for acquittal and may consider the credibility of witnesses and may weight the import of evidence." United States v. Delanoy, 867 F. Supp. 117, 119 (N.D.N.Y. 1994).

Nonetheless, the authority must be exercised "'sparingly' and in 'the most extraordinary circumstances,'"

Ferguson, 246 F. 3d at 134 (citation and internal quotation marks omitted), viz. to prevent the defendant from being the victim of a manifest injustice.  Fed. R. Crim. P. 33(a).

By way of format, initially the claimed improper summation ground will be addressed, followed by a discussion of the ground predicated on the Court's jury charge, recognizing that Sheehan asks that the two be considered cumulatively, or together in determining whether he was denied a fair trial.

2.  Statements Made by the Prosecutor During
    Her Summation and Rebuttal Summation

Defendant maintains that "the government [1] repeatedly misstated the evidence and [2] injected its personal belief into its arguments" to the defendant's detriment (Def.'s July 1, 2013 Letter in Supp. at 11-12) even though such comments were "concede[dly] . . . not made in bad faith."  (Id., 11.)

a) Claimed Misstatements of Evidence

Defendant maintains that the following comments by the prosecutor constitute misstatements of the evidence:

> [1]  Pipe bombs, if you unscrew them and
>      there is any smokeless powder in
>      the threading, it's going to
>      explode.  (Trial Tr. 666.)

> [2]  Both the FBI expert and the
>      defendant's own words and actions
>      prove to you that he planted a
>      working, functional pipe bomb,
>      explosive device, destructive
>      device, all of the above in the
>      Huntington Home Depot.  (Trial Tr.
>      671.)

[3]     Everybody agreed, even the defense
                expert – which you should take
                whatever parts of his testimony you
                think were correct, if any – but
                even he said it could be readily
                converted into a bomb, by his
                expert's own admission, readily
                converted.  (Trial Tr. 707.)

        [4]     [B]oth experts testified[,] no
                fusing system necessary.  (Trial
                Tr. 712.)

(Def.'s July 1, 2013 Letter in Supp. at 12.)

        The ABA Standard for Criminal Justice 3-5.8, entitled

"Argument to the Jury," provides in pertinent part: "(a) In

closing argument to the jury, the prosecutor may argue all

reasonable inferences from evidence in the record.  The

prosecutor should not intentionally misstate the evidence or

mislead the jury as to the inferences it may draw."  ABA

Standards for Criminal Justice 3-5.8(a)(3d ed. 1993).

        Significant prosecutorial misstatements of the evidence

may, depending on the circumstances, jeopardize a conviction.

United States v. Watson, 171 F.3d 695, 699-700 (D.C. Cir. 1999).

Such instances are rare however.  United States v. Gordon-Smith,

2014 WL 1099129, *2 (2d Cir. Mar. 21, 2014)(summary order)("As a

general matter, a defendant asserting that a prosecutor's remarks

warrant a new trial faces a heavy burden, because the misconduct

alleged must be so severe and significant as to result in the

denial of his right to a fair trial. . . .  It is a rare case in

which improper comments in a prosecutor's summation are so

prejudicial that a new trial is required.")(internal quotation marks and citations omitted.)

As to the first targeted statement, i.e. # [1] above, perhaps a less categorical assertion by the prosecutor, such as using the word "could" or the phrase "would be likely to cause an explosion" would have been a more linguistically exact description of the testimony of government experts Rigopoulos and Yeager. But the need for even that modification is not as crystal clear as it might be as evidenced by a review of the Rigopoulos's and Yeager's direct examinations. The relevant excerpt from Rigopoulos's testimony reads:

> Q   Now, can a pipe bomb consist of a pipe, two end caps and smokeless powder also?
>
> A   Yes.
>
> Q   And even without a fuzing system?
>
> A   Yes.
>
> Q   Sir, without a fuzing system, how does a pipe, two end caps, and smokeless powder qualify as a bomb or an IED?
>
> A   The way that that would function would be if there is heat, shock or friction initiated into that explosive material. And the way that can happen is just with the pipe in the end caps, or if it was dropped, or if somebody tried to open up those end caps, that opening action and unscrewing the end caps in the metal threads generates friction.

> As I mentioned, friction causes
> heat, and that may be another way
> that it can function.

Tr., at 410:14-411:5.

The testimony of Yeager on his direct examination during the government's rebuttal case essentially mirrored Rigopoulos's on the same point. Thus, Yeager answered "yes" to the following question posed by the prosecutor: "[A]s I understand your testimony, the rubbing of the end caps in the threading causes friction, which causes heat, which ignites smokeless powder[.]" Id., 632:16-19.

In sum, the subject comment by the prosecutor finds adequate inferential support in the record, thereby precluding it from being legitimately labeled as a misrepresentation of the evidence as distinct from a plausible argument based on the evidence.

So too with respect to the second comment targeted by the defendant. A juxtapositioning of Sheehan's description of the ingredients in the device he planted in Home Depot (as recited in government's exhibit 34), with Rigopoulos's testimony that such a device constitutes an explosive bomb, provided a solid basis for the prosecutor's statement.

As to the third claimed misstatement, defendant maintains:

> Contrary to the government's assertion in
> summation, "the defense expert" did not say

that the device "could be readily converted into a bomb." Indeed, Parker testified that it would "probably [be] easier to start all over." (Trial Tr. 502). According to Parker:

> First you would have to get it off the shelf, presumably under the cover of night or something, darkness, so no one else could see. Then you would have to open the package, remove the pipe, unscrew the end caps, have another igniter to reattach to the red and white wires, and then reassemble the device, connect the electrical circuit, provide a secure type of connection to the battery[,] and then the device could become operable.

> (Trial Tr. 503.) When asked how long such a process would take – under the right conditions <u>and</u> with the needed parts – Parker answered, "Well, minutes, probably less than an hour."

(Def.'s July 1, 2013 Letter in Supp. at 13.)

In defending the propriety of her statement, the prosecutor cites the following excerpts from Parker's testimony on cross-examination:

> Q    Switch to battery takes a couple of seconds. The wire to the switch to battery, slap it on it and it's connected?

> A    If you have some sort of way to connect that battery, yes, ma'am. (Trial Tr. 537.)

>                    . . . .
> Q    . . . . Construction adhesive in a ketchup packet could attach a wire to a battery, correct?

```
              A    Oh, certainly.

              Q    Really pretty quickly, right?  Slap
                   on some adhesive or slap on the
                   wire, or vice versa, right?

              A    That's possible.

              Q    It wouldn't take an hour, right?

              A    That wouldn't take an hour, no,
                   ma'am.  (Trial Tr. 541-542.)
```

(Gov't's July 15, 2013 Letter in Opp'n at 10-11.)

The current dispute concerning Parker's testimony seems to hinge on the government and defendant harboring different perceptions as to the meaning of the term "readily assembled" in § 921(a)(4)(C).  As I understand it, defendant apparently perceives the relevant time period as being measured in seconds, presupposing that the person modifying the device has the needed parts – such as, in this case, adhesive tape – on his person or within his immediate grasp.  The government sees the temporal and proximity requirements in a more expansive sense, i.e. one that, although necessarily brief and close-at-hand by definition, depends on the accompanying circumstances.

Given the government's understanding of what "readily assembled" means — which, the Court believes, is in line with its common sense, everyday meaning — the challenged comment constituted fair comment rather than a misstatement of the evidence.

Finally, the prosecutor argued during her rebuttal

summation that "both experts testified: no fusing system [is] necessary," referring apparently to Rigopoulos and Parker, to the exclusion of Yeager. Tr., 712:1-2. That, defendant contends, is a misstatement based on Parker's testimony that Sheehan's device was not an explosive bomb because "'[i]t lack[ed] the assembly to be exploded.'" (Def.'s July 1, 2013 Letter in Supp. at 13, quoting Tr., 485-486.)

The prosecutor's one-line comment is clearly contrary to the gravamen of Parker's testimony if considered in isolation. However, if evaluated in the context in which it was given, a different picture, one of fair comment, emerges. The full statement reads:

> Again, both experts testified; no fusing
> system necessary. The fusing system could be
> brought after the fact in two ways in this
> case; somebody unscrewing an end cap, or the
> defendant coming back a third time with maybe
> a mustard packet [and connecting the wires to
> the battery, thereby closing the open circuit
> and rendering the fusing system operative.]
> The first time it was a ketchup packet filled
> with the epoxy [used to glue the string to
> the shelf]. Maybe he comes back a third time
> and brings an epoxy in a mustard packet,
> glues the wires to the battery, we're ready
> to go.

Tr., 712:1-8.

In sum, defendant's position that the government misstated the evidence during her summation and rebuttal summation is not convincing. And to the extent some of her comments were not as nuanced as the power of hindsight in a non-

summation setting would permit, the difference between what was said and might have been said did not compromise Sheehan's right to a fair trial.  Additionally, it warrants mention that (1) the jury was told both in the Court's preliminary instruction, Tr., 121:8-11, and in the charge that statements by counsel are not evidence, id., 721:13-14, (2) the prosecutor, during her rebuttal summation, told the jury, "you don't have to take my word or Mr. Lato's word" for a disputed or other item of evidence in that you are entitled to read-backs, id., 711:17-22, and (3) none of the now-targeted comments were the subject of an objection when made, nor thereafter broached until cited in the current motion, even though Sheehan's trial counsel is a highly experienced and skilled litigator.

      (b) <u>Charged Personal Belief Errors by Prosecutor</u>

Defendant submits that the prosecutor committed five "personal-belief errors" during her rebuttal summation.  (Def.'s July 1, 2013 Letter in Supp. at 13-14.)  Among those comments are "I think Mr. Lato has a fundamental misunderstanding of the evidence," (<u>Id.</u>, 13, <u>citing</u> the trial record at 712), as well as the following:

> "Mr. Lato is a good lawyer.  But what isn't
> he?  He is not a bomb tech. . . . [I]t was
> his idea, let's throw the bomb in water.
> Until oops, it came out in the trial that it
> was not such a good idea to throw the pipe
> bomb in water.  Oh, but that was a diversion.
> Didn't mean it.  It is kind of like the
> defendant saying, putting a pipe bomb in Home

> Depot, but saying, oh, no, it was inert,
> after the fact.
>
> He is also not a mind reader.  He . . . told
> you all of the things that the FBI agents
> were thinking while this was going on.  They
> were thinking about how not to help the
> defendant, and they were thinking about how
> to be evasive.  Good lawyer.  Not a bomb tech
> and not a mind reader.

(Id., citing Tr., at 705.)

It is axiomatic that it is improper for counsel "to interject personal beliefs into a summation."  United States v. Nersesian, 824 F.2d 1294, 1328 (2d Cir. 1987).  The problems caused by a breach of that rule are compounded when the prosecutor – as she did here as to the first of the two above challenged statements – commences her rebuttal by indicating that, in her view, the defense attorney has "a fundamental misunderstanding of the evidence," thereby arguably permitting the inference that his comments about that evidence are necessarily suspect and thus should be rejected out-of-hand.  To state the obvious, the focus should have been on the message, not the messenger.  To measure the possible harm attributable to the remark, however, it must be considered in its specific context.  So viewed, its probable effect on the fairness of the proceeding, if any, is de minimis.  Its utterance is immediately followed by, i.e. implicitly linked to, the government's argument regarding the markedly divergent expert testimony in the record as to heat likely to be generated from unscrewing one of the device's end caps.  The comment must also be evaluated against the backdrop of the entire trial.  United States v. Young, 470 U.S. 1, 12 (1985).  Using that broader perspective, the likelihood of any meaningful harm to the defendant is even further diminished.

Attention will now be focused on the prosecutor's

characterization of defense counsel as neither a "bomb tech" nor

a  "mind reader."  Those comments, like all the challenged

"personal-belief" comments, occurred during the government's

rebuttal summation.  As a result, "we must evaluate the

challenged remarks in the context of the trial as a whole

[including the defendant's summation], for the government is allowed to respond to argument that impugns its integrity or the integrity of its case.  Thus, when the defense has attacked . . . the credibility of the government agents, the prosecutor is entitled to reply with rebutting language suitable to the occasion."  United States v. Rivera, 22 F.3d 430, 438 (2d Cir. 1994)(internal quotation marks and citations omitted).

Several themes ran through defendant's summation including that: (1) government witnesses Special Agent Dwayne and FBI Chemist McCollum purposely and unnecessarily were evasive in answering questions on cross-examination, each acting under the shared mantra of "try[] not to [say anything] to help the defendant," (Tr., 686:23), (2) for essentially the same reason, Special Agent Rigopoulos altered his testimony about the need for an "IED" to have a "fuzing system" under the theory that "[i]f the facts don't fit the theory, change the facts," (id., 689:24-25), and (3) Special Agent Rigopoulos's claimed expertise vis-a-vis explosive devices was said to be problematic given that he "quickly got in trouble" when defendant "brought up Little Boy and Fat Man, the two atomic bombs dropped on Japan," (id., 693:15-16, 25).  Indeed, when the line of inquiry shifted from "whether Little Boy was a uranium gun type device," (id., 693:18-19), to questions about "the more complicated device, Fat Man," (id. 694:9-10), Rigopoulos's purported confusion and evasiveness

both escalated.  As defense counsel argued to the jury:

> But when he was confronted with the more
> complicated device, Fat Man, the plutonium
> implosion device from Nagasaki – when I asked
> him whether chemical explosions around the
> sphere of the device are needed to compress
> the plutonium at the center of the sphere, he
> realized evasion wasn't going to work any
> more.  He figured, you know what?  We better
> get out of this topic because I don't know as
> much as I first pretended to know.  He
> answered, That's correct.

(Id., 694:9-17.)

The attack on the forthrightness and integrity of
government witnesses Dwayne, McCollum and Rigopoulos, and upon
the very competence of Rigopoulos as the government's expert on
explosive bombs, invited a vigorous rebuttal summation.  In that
context, it was not inappropriate for the government to argue to
the jury that defense counsel – notwithstanding his fact laden
questions on cross-examination and the authoritative tenor of his
summation – is neither a "mind reader" nor a "bomb tech."

In addition to the two claimed "personal-belief errors"
addressed thus far, the Court has also considered each of the
others advanced by defendant.  Those include the prosecutor's
comment that (1) "Mr. Lato is also not an expert on the tackiness
of tape," (2) that she was unable to find certain testimony in
the record cited by defense counsel, and (3) her reservations
about the relevance of the cross-examination about Fat Boy and
Little Boy.  (Def.'s July 1, 2013 Letter in Supp. at 13-14.)  As

to those three additional items, the thrust of the Court's prior
"bomb tech" and "mind reader" observations apply to the
prosecutor's "tackiness of tape" comment, i.e. item "(1)"; as to
item "(2)," that statement, coupled as it was by an invitation
for the jury to ask for a read-back, falls within the range of
reasonable comment (see Tr., 711:14-22); and as to item "(3),"
reasonable persons could disagree as to whether the unobjected to
questions on cross-examination about the bombs dropped on
Nagasaki and Hiroshima constituted a germane subject for probing
Rigopoulos's expertise about pipe bombs.

Finally, defendant maintains that the prosecutor
"implied that defense counsel's 'water diversion' was a lie[] . .
. [which] the government likened . . . to Sheehan's alleged lie
of having placed an inert device in the Home Depot.'"  (Def.'s
July 1, 2013 Letter in Supp. at 14.)  "If there is a reasonable
likelihood that the jury would understand the prosecutor's
statements as an assertion that defense counsel sought to deceive
the jury, misconduct would be established."  People v. Cummings,
850 P.2d 1, 45 (Sup. Ct. Cal. 1993).

By way of background, one of the numerous lines of
inquiry pursued by the defense during cross-examination of
Rigopoulos concerned the use of water to "disable[]" an "IED."
Tr., 452:20-453:13; see also id., 455:9-456:9.  During the
prosecutor's summation, she told the jury that even defense

expert Parker agreed that "it would be a bad idea to put this pipe in water if you don't know what is inside of it." Id., 671:17-18. In response, defense counsel explained during his summation that "perhaps the government didn't realize that the whole bringing up of the water was a defense diversion. Of course water can't be used." Tr., 693:10-13. That explanation led to the prosecutor's misguided effort to compare defense counsel's explanation behind his quizzing Rigopuulos about the use of water as a disarming agent on the one hand, and defendant's claim that the device he planted in Home Depot was inert on the other. The strained analogy would have been better left unsaid. But, as noted in one of the cases cited by the defense, an "improper-argument error of this type [– 'impugning the veracity of opposing counsel' –] is non-constitutional in nature, and a non-constitutional error that does not affect substantial rights must be disregarded." Brown v. State of Texas, 270 S.W.3d 564, 572 (Ct. of Crim. Appeals of Texas, 2008)(internal quotation marks and citations omitted), cited in Def.'s July 1, 2013 Letter in Supp. at 14; see also to the same effect the other two cases cited by defendant on this point, People v. Cummings, 850 P.2d 1, 45-46 (Sup. Ct. Cal. 1993) and United States ex rel. Hunley v. Godinez, 784 F. Supp. 522, 527-28 (N.D. Ill. 1992), aff'd, Hunley v. Godinez, 975 F.2d 316 (7th

Cir. 1992).[15]

That the subject remark here was "non-constitutional in nature" is evident for a number of reasons including: (1) although the prosecutor challenged the accuracy of defense counsel's articulated reason for asking certain questions, the subject of her doubt was confined to a largely irrelevant topic, to wit, a non-productive line of inquiry pursued on cross-examination, and (2) to assess any resulting harm in a scenario of this sort typically calls for a focus broader than the comment itself; here, counsel, while both forceful advocates, treated each other — with the possible exception of the instant comment — with the utmost of respect and professionalism throughout the trial, thereby virtually eliminating the likelihood that the jury would consider the prosecutor's comment as some type of broad-based challenge to defense counsel's credibility. And, as earlier noted, "Sheehan concedes that the improper comments were not made in bad faith." (Def.'s July 1, 2013 Letter in Supp. at 11.)

_____

[15] Defendant's representation as to the holding in Hunley is inaccurate. While it is true that a writ of habeas corpus was granted in that case and that, as noted by the defense, "'[t]he prosecutor improperly accused defense counsel of lying and [of] misstating the facts,'" there was no causal connection between the two. (Def.'s July 1, 2013 Letter in Supp. at 14, quoting Hunley, 784 F. Supp. at 527.) The writ was granted because of "presumptive bias" involving "at least four jurors" attributable to a "jury burglary" which occurred during deliberations which bore "a close connection . . . [to] the criminal conduct on trial." Hunley, 784 F. Supp. at 533.

The likely impact of the prosecutor's remark falls somewhere between non-existent and de minimis as demonstrated by defense counsel's delayed reaction to its utterance. Notwithstanding his unusually extensive federal and state experience as a litigator in criminal matters, he was not heard to complain about the comment now under discussion by voicing an objection prior to the current written motions being filed, thus, incidentally, (a) precluding the Court from taking contemporaneous corrective action if such action was required, and, more importantly for present purposes, (b) suggesting that the remark was not deemed sufficiently troubling to capture defense counsel's attention absent studied reflection after the fact. Accordingly, it seems probable that the jury was not adversely impacted by the statement and, in any event, the defendant has not set forth a plausible argument to the contrary. In sum, although the prosecutor's convoluted analogy was improper, there is nothing to suggest that it deprived the defendant of a fair trial necessitating a retrial.

(c) Conclusion as to Government's Purported
    Improper Comments via Misstatements of
    Evidence and by Interjecting Personal
    Beliefs Into Concluding Arguments

As noted by the defendant, citing Young, 470 U.S. at 11: "Standing alone, the government's improper comments – which defense counsel did not object to – probably did not deprive Sheehan of a fair trial." (Def.'s July 1, 2013 Letter in Supp.

at 16.)  "But [those comments][16] coupled with the Court's faulty

jury charge [, defendant contends,] . . . contributed to it."

Id.  That takes us to the next and final position advanced by

defendant in seeking a new trial, to wit, the Court's final

instruction to the jury.

3.  Court's Charge

(a) Introduction

The thrust of defendant's Rule 33 motion is that flaws

in the Court's charge, considered in conjunction the government's

statements during its summation and rebuttal summation, require

that Count Two be retried.  Under such circumstances, defendant

correctly notes, "the standard of review before this Court is the

same as on appeal."  (Jenks's Apr. 10, 2014 Letter at 1 (internal

quotation marks and citation omitted).)  As a result, the

"Government's contention that competent, satisfactory and

sufficient evidence support Sheehan's conviction . . . even if

true (which is not conceded [by defendant]), is thus irrelevant

to whether a new trial should be granted.  Regardless of the

sufficiency of the proof, the defendant's claims of improper

summation and instructional error must stand or fall on their own

merits."  (Id., 2 (internal quotation marks and citation

omitted).)

_____

[16]  For reasons provided in the text, supra, most of the
claimed "improper comments" were clearly inaccurately labeled by
defendant.

The standard of review utilized by the Second Circuit, and, accordingly, applicable here for present purposes is synopsized thusly in <u>United States v. Ganim</u>:

> We review jury charges <u>de</u> <u>novo</u>, reversing only where a charge either failed to inform the jury adequately of the law or misled the jury about the correct legal rule. No particular form of words is required, so long as "taken as a whole" the instructions correctly convey the required legal principles. Moreover, this Court does not review portions of the instructions in isolation, but rather consider[s] them in their entirety to determine whether, on the whole, they provided the jury with an intelligible and accurate portrayal of the applicable law.

510 F.3d 134, 142 (2d Cir. 2007)(most internal quotation marks and all citations omitted).

(b) <u>Relevant Portions of Charge and of § 921(a)(4)</u>

Defendant quotes the following portions of (i) the Court's jury charge, and (ii) § 921(a)(4) as the backdrop for his attack on the charge:

> [i] A destructive device has several meanings under the statute. But for the purpose of this case, the only relevant meaning is an explosive bomb. And this would include (a) an explosive pipe bomb or[] (b)[] any combination of parts either designed or intended for use in converting any device into an explosive bomb and from which an explosive bomb may be readily assembled. The terms <u>explosive</u>, <u>readily</u> and <u>assembled</u> should be interpreted consistent with their everyday ordinary meanings. In this case there has been evidence presented regarding the nature of the device found at the Home Depot, and it is for you to determine from all of the

evidence whether this device was an explosive
bomb or may be readily assembled into an
explosive bomb.

. . . .

The term destructive device shall not include
any device that is not designed for use as a
weapon.  In determining whether the device in
this case was, or was not[,] designed for use
as a weapon, your analysis must be objective
rather than subjective in nature.  You must
focus solely on the physical structure and
operational characteristics of the device in
determining its purpose.

(Def.'s July 1, 2013 Letter in Supp. at 5, quoting Tr., 740,

742-43); and

> [ii] The term "destructive device" means-
>
>> (A) any explosive . . .
>>
>>> (i) bomb,
>>>
>>>> . . .
>>>
>>> (v) . . . or
>>>
>>> (vi) device similar to . . . [a bomb]
>>>     . . .;
>>
>> (B) . . . and
>>
>> (c) any combination of parts either
>> designed or intended for use in converting
>> any device into [an explosive bomb] and from
>> which a destructive device may be readily
>> assembled.
>>
>> The term "destructive device" shall not
>> include any device which is [not] designed .
>> . . for use as a weapon.

(Id., 16, quoting 18 U.S.C. § 921(a)(4)).

> (c) Overview of Claimed Flaws in the Charge

Defendant contends that the charge was improper in that (i) the Court should have confined its instruction regarding the applicable statute to Section 921(a)(4)(A)(i) (hereinafter "(4)(A)") defining a "destructive device" as including "any explosive . . . bomb," and "should not" have added Section 921(a)(4)(C) (hereinafter "(4)(C)") to its instruction, (id., 6); (ii) the Court compounded the error brought about by charging (4)(C) by then providing the jury with an erroneous instruction as to that subdivision; specifically, the Court failed to explain that under the "intended" prong of (4)(C), the defendant's subjective intent was the appropriate focus or measure, (id., 6-7); and (iii) the Court mistakenly instructed that the "[t]erms [']explosive['], [']readily['] and [']assembled['] should be interpreted consistent with their everyday ordinary meanings," (Tr., 740:18-20); instead, defendant posits, the Court should have provided the dictionary definitions of those terms as they appear currently in Merriam-Webster, supplemented by a further instruction that "all of the essential parts must be present" before unassembled components may be "readily assembled" for (4)(C) purposes, (id., 19).

Before addressing each of the proffered deficiencies in the charge cited by Sheehan, the issue as to the relevance under (4)(A) of his claimed intent to create "a model of a pipe bomb" warrants discussion. (Id., 1.)

-43-

(d) Defendant's Claimed Intent is Irrelevant Under
        Section 921(a)(4)(A)

     Parenthetically, had the Court instructed the jury

solely on subsection (4)(A) of Section 921(a) as Sheehan insists

should have been done, his asserted intent to plant "a model of a

pipe bomb" (Def.'s July 1, 2013 Letter in Supp. at 1) would have

been irrelevant. See, e.g., United States v. Johnson, 152 F.3d

618, 627 (7th Cir. 1998)(holding that for "fully assembled

devices that are clearly bombs . . . the only issue is whether

the objective characteristics of the device bring it within the

ambit of the statute; subjective intent regarding the device is

not an appropriate consideration in that inquiry"); Posnjak, 457

F.2d at 1119 ("When it is clear that the assembled device . . .

falls within (1) . . . [of 26 U.S.C. § 5845(f), i.e. the

equivalent of § 921 (a)(4)(A)], intent is irrelevant . . . .");

United States v. Worstine, 808 F. Supp. 663, 668 (N.D. Ind.

1992)("[R]egardless of Worstine's original intentions to create a

'firecracker', the exploding device Worstine manufactured from a

five inch length of 1" diameter galvanized metal pipe, black gun

powder, fuse, and galvanized metal end caps is a 'destructive

device' as defined in 26 U.S.C. § 5845(f), and does not fall

within the exception found therein [viz., that a destructive

device shall not include any device which is neither designed or

redesigned for use as a weapon]".).

     Accordingly, Sheehan's statement in his letter to Home

Depot (Gov't's Ex. 36) and to law enforcement (Gov't's Ex. 34) that his goal all along was to create a faux, rather than explosive bomb as part of his extortion scheme is of no moment under (4)(A).  What defendant created, rather than what he intended to create controls under this subsection of § 921(a).[17]

Johnson, 152 F.3d at 621 (district court did not err in excluding evidence as irrelevant of defendant's subjective intent - viz. to "play the hero [by] discovering the bomb-like devices" that he had planted as a hoax - given "that the devices at issue had objective characteristics that brought them within the statutory definition of [a] 'destructive device.'").

The Court recognizes that treating Sheehan's claimed intent as essentially meaningless for (4)(A) purposes may seem at odds with the portion of the statute which reads: "The term 'destructive device' shall not include any device which is neither designed nor redesigned for use as a weapon."  18 U.S.C. § 921(a)(4).  Indeed, Sheehan apparently is of the belief that the device he created – supposedly meant to be inert — was not "designed" for use as a weapon and, ergo, was not one.  For that rationale to be sound, however, the meaning of the statutory

---

[17] While an argument could be made that a defendant's subjective intent in creating a device may have some bearing on the nature of the device he actually created and thus be at least marginally relevant, Rule 403 concerns, such a confusion of the issues, would counsel in favor of precluding such a line of inquiry.

terms "designed" and "intended" must be synonymous.  But such is
not the case.  As explained by the Second Circuit:

> The definition [of destructive device]
> contains several exceptions; nothing neither
> "designed nor redesigned for use as a weapon"
> is included.  The legislative history
> indicates that "designed" <u>in this context</u>
> refers to objective, physical structure or
> method of operation and not to intent or
> schemes of the possessor.

<u>Posnjak</u>, 457 F.2d at 1116 (emphasis added).[18]

The purpose of the subject excepting language is to
exempt from the statute's reach socially beneficial commercial or
industrial devices which would "otherwise appear[] to fall within
[its ambit]."  <u>Id.</u>  A prime example of such is "a stick of
commercial or industrial dynamite ready for use in blasting."
<u>Id.</u>, 1116-17.  But for this exception, "every manufacturer and
seller of commercial dynamite would have to register it and would
fail to do so only in reliance on his ability, once arrested and
prosecuted, to show that it was not 'designed' for use as a
weapon.  Such an interpretation of the statute, particularly as
'designed' is used in an objective and not a subjective sense, is

_____

[18]  Incidentally, as explained in <u>Posnjak</u>, 457 F.2d at 1117,
"the exception [found in the current statutory definition of a
destructive device] about objects 'neither designed nor
redesigned for use as a weapon' was pared from an earlier
[proposed] version which excluded items 'neither designed nor
redesigned nor used nor intended for use as a weapon.'" Had the
earlier definitional version not been modified, Sheehan's
purported intent would presumably have been germane under (4)(A).

clearly incongruous with Congressional intent." Id., 1117.

Sheehan's explosive device had no legitimate purpose; its sole function was to advance his effort to extort millions of dollars from Home Depot.

In sum, Sheehan's subjective intent was irrelevant to his prosecution under Count Two pursuant to 18 U.S.C. § 921(a)(4)(A). But, of course, his complaint is that the Court also charged the jury mistakenly under subdivision (4)(C) of § 921(a)(4). Attention will be focused on that alleged defect in the charge.

      (e) Both Subsections (4)(A) and (4)(C) Were
           Required to be Charged to the Jury Given
           the Evidence Adduced at Trial

It is the Court's obligation to provide the jury with the law pertaining to factual issues framed by the proof. The experts called by the prosecution told the jury that Sheehan's device, even if it lacked a fusing system, was a destructive device capable of exploding as it did during the disarming process. Defendant's expert espoused a contrary view, opining that the device "lacks the assembly to be exploded," Tr., 486:14, and disagreeing with the rationale underlying Rigopoulos's opinion that the device could explode if dropped or if someone had attempted to unscrew one of its end caps.[19] Id., 492:5-

_____

[19] Although Parker disagrees with Rigopoulos's conclusion about the device's potential to accidently explode, the same expert opinions appear in several appellate decisions affirming

-47-

496:20.

The experts not only disagreed as to whether the device
was capable of exploding as assembled by Sheehan and thus was a
destructive device under (4)(A), but also as to whether the
component parts of the Sheehan's contraption – if deemed not
complete – could be readily assembled into a pipe bomb under
subdivision (4)(C).  As to that issue, the government maintained,
inter alia, that the tape on the lighting box in which the device
was housed could be utilized to close the circuit while defendant
countered with the position that the tackiness of that tape was
inadequate for the task.  Moreover, differing evidence was placed
before the jury as to the time likely to be required to render
the device operable under the alternative (4)(C) theory.

Simply put, the nature and breadth of the evidence
required that the Court charge both subsections (4)(A) and
(4)(C).  Which is to say, defendant's position that (4)(C) should
not have been charged is incorrect.

> (f)  Defendant's Claimed Intent is Also
> Irrelevant Under (4)(C) Given That
> Sheehan's Device Served no Legitimate

---

convictions for possessing explosive bombs.  See, e.g., United
States v. Uzenski, 434 F.3d 690, 701 (4th Cir. 2006)(both
government experts "testified that the first device could
detonate simply by screwing off the end caps because the powder
could interact with the metal threadings of the pipe"); and
United States v. Langan, 263 F.3d 613, 626 (6th Cir.
2001)(government expert "testified that the device was capable of
explosion by being thrown or dropped, even if it did not contain
an 'apparent classic initiator.'").

<u>Purpose as a Matter of Law</u>

Given the proof at trial, the Court was required to charge both (4)(A) and (4)(C). The question remains, however, whether the (4)(C) instruction provided to the jury was correct and, if not, was the defendant harmed by its shortcoming.

Initially, it is important to recognize, as explained by the Second Circuit, that subdivision (4)(C) "does not broaden the group of devices which are covered; it merely precludes evasion through possession of the unassembled components instead of the assembled item." <u>Posnjak</u>, 457 F.2d at 1116. But if the purpose of (4)(C) is as stated in <u>Posnjak</u>, why does it speak of any combination of parts designed or "<u>intended</u>" for conversion to a destructive device? Shouldn't "designed," evaluated objectively, be sufficient as it is under (4)(A)? That question calls for a negative answer because, as noted earlier, the purpose of (4)(C) is to provide a mechanism to distinguish between the possession of component parts which could be assembled either for a legitimate or illegitimate purpose. In such "ambiguous" situations, where "the component parts . . . are susceptible to both violent abuse and beneficent use, the analysis . . . may require consideration of intent." <u>Johnson</u>, 152 F.3d at 624-28; <u>see also</u> <u>United States v. Saunders</u>, 166 F.3d 907, 914 (7th Cir. 1999)("If the objective design of the device indicates that the object serves no legitimate social or

-49-

commercial purpose, subjective intent is not relevant to the analysis. However, if the assembled device or unassembled parts may form an object with both a legitimate and a nonlegitimate use, then subjective intent must also be shown.")(internal citation omitted); and Graziano, 616 F. Supp. 2d at 364 ("[T]he Court [in Posnjak] . . . made clear that, when the household items have been assembled in a manner that may be used legitimately but also could be used as a 'destructive device,' intent may be considered under subsection (C) of the 'destructive device' definition[.]").

If the jury accepted Parker's testimony and concluded that Sheehan's device was not sufficiently assembled to be capable of exploding when he placed it on a shelf at Home Depot, abundant evidence indicates it was very close to completion. All that remained to be done for it to be fully operational, if anything, was for two wires to be taped to the battery thereby completing its electrical circuitry. In its near-totally assembled state, it was obvious as a matter of law that the device was devoid of any conceivable legitimate or socially beneficial purpose. Accordingly, (4)(C)'s "subjective intent" mechanism – operative in ambiguous situations only - does not come into play.

In sum, ambiguity – as explained earlier – is the pivotal gateway for the admission of evidence of subjective

intent under (4)(C), a precondition absent here. If the jury found that the government failed to prove its case under (4)(A), it became its responsibility to decide whether Sheehan's device could be readily assembled under the objectively-assessed "design[]" element of (4)(C). In discharging that function, the question was what did Sheehan create, not what he intended to create. Interjecting defendant's irrelevant mind-set into the analysis under the other disjunctive, i.e. "intended" prong of (4)(C) would have been contrary to well established law for the reasons indicated.

> (g) Court's Instruction on "Readily
>     Assembled" Not Shown to be Inadequate

The Court, in instructing the jury on the term "destructive device," stated in pertinent part:

> The terms . . . <u>readily</u> and <u>assembled</u> should
> be interpreted consistent with their everyday
> ordinary meanings.
>
> In this case there has been evidence
> presented regarding the nature of the device
> found at Home Depot, and it is for you to
> determine from all the evidence whether this
> device was an explosive bomb or may be
> readily assembled into an explosive bomb.

Tr., 740:18-25. In defendant's view that instruction was flawed in that dictionary definitions should have been provided for both "readily" and "assembled," coupled with an instruction that "<u>all</u> of the essential parts must be present." (Def.'s July 1, 2013 Letter in Supp. at 19.)

To the extent a term is in ordinary and common usage in the community – such as "readily" and "assembled" – the need for definitions from any source is problematic. <u>See generally</u> 89 C.J.S. Trial § 639, entitled "Definition or explanation of terms" ("Terms used in instructions should be defined by the court where they have a legal or technical meaning, but ordinary terms used in their usual or conventional sense need not be defined or explained.")

Here, of course, "readily assembled" is found in a statute. But there is nothing to suggest that the component parts of the term, or the term itself, has developed some type of unique "legal or technical meaning" vis-a-vis (4)(C). Indeed, the dictionary definitions set forth in defendant's July 1st submission dovetail, as would be expected, with their common usage and understanding.

As to the "essential parts" issue broached by the defense, it is questionable whether "tape" would be deemed by the Circuit as an essential component of a destructive device per se for (4)(C) purposes. However, if the jury found that tape was needed to "readily assemble" or convert Sheehan's creation into a "destructive device," the Court's direction that it consider "all the evidence" presented in making its determination constituted an adequate instruction in that regard.

     (h) Court's Utterance of the Term "Or
         Intended" in Synopsizing (4)(C)

did not "Open the Gates" to a Discussion
of Defendant's Subjective Intent and,
<u>at Most, Constituted Harmless Error</u>

Even though it would have been error for me to have charged the jury under the disjunctive "intended" prong of (4)(C), I did, as defendant emphasizes, instruct:

> A destructive device has several meanings under the statute.  But for the purpose of this case, the only relevant meaning is an explosive bomb.  And this would include (a) an explosive pipe bomb or[] (b)[] any combination of parts either designed <u>or intended</u> for use in converting any device into an explosive bomb and from which an explosive bomb may be readily assembled.

(Def.'s July 1, 2013 Letter in Supp. at 17, referencing Tr., 740:12-18.)

Does it follow, as defendant maintains, that having mistakenly uttered the term "or intended" during the charge, the Court was then obligated to direct the jury to consider Sheehan's professed subjective intent with respect to (4)(C)?  The answer to that query is "No," not only because of the critical lack of ambiguity as to whether Sheehan was creating a socially beneficial device, but also because such an instruction would be violative of <u>Posnjak's</u> caveat that (4)(C) does not create another and distinct category of proscribed devices but merely seeks to preclude individuals from evading responsibility for covered items – i.e. those within (4)(A) – via "possession of the unassembled components instead of the assembled item."  457 F.2d

at 1116.

Finally, how did the insertion of the term "or intended" in the charge harm the defendant?  If anything, it was to his benefit in that it suggested, albeit erroneously, that his intent, although irrelevant under (4)(A), might somehow be germane under the "intent" prong of (4)(C).  Simply put, the flaw in the instruction was harmless from defendant's perspective and, as a result, not a ground to disturb the jury's verdict.

4.  Conclusion as to Defendant's Motion
    for a New Trial Under Rule 33

Neither the prosecutor's statements during her closing arguments or the Court's charge, whether viewed singularly or together, denied defendant a fair trial.

CONCLUSION

For the reasons indicated, defendant's motion under Rule 29 for a judgment of acquittal as to Count Two or, alternatively for a new trial under Rule 33 as to that Count, is denied.

SO ORDERED.

Dated: July 11, 2014
       Central Islip, New York

_____
                          DENIS R. HURLEY, U.S.D.J.